UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

CONSTANCE S. KEISER,                    :

                    Plaintiff,          :          99 Civ. 12101 (WHP)

          -against-                     :          OPINION AND ORDER

FIRST UNUM LIFE INSURANCE               :
COMPANY,
                                        :
                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

WILLIAM H. PAULEY III, District Judge:

          This action arises out of denial by Defendant First UNUM Life Insurance

Company's ("First UNUM") of long term disability ("LTD") and life insurance benefits to

Plaintiff Constance S. Keiser ("Plaintiff" or "Keiser"). Plaintiff alleges that First UNUM's denial

violates the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.

("ERISA"). This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29

U.S.C. § 1132(e). This Court conducted a bench trial.[1]


                              FINDINGS OF FACT

          This Opinion and Order presumes familiarity with the Court's prior decisions in

this action. See Keiser v. CDC Inv. Mgmt. Corp., 2004 WL 516212 (S.D.N.Y. Mar. 17, 2004)

("Keiser III"); Keiser v. CDC Inv. Mgmt. Corp., 2003 WL 1733729 (S.D.N.Y. Mar. 25, 2003)

("Keiser II"); Keiser v. CDC Inv. Mgmt. Corp., 160 F. Supp. 2d 512 (S.D.N.Y. 2001) ("Keiser

I").

---

[1]  Insofar as the Court exercises its prerogative as finder of fact to determine the weight and
credibility of the evidence, the discussion is limited to the evidence that this Court credits.

I. The Parties

      Keiser, a New York resident, was born on May 22, 1951. (Trial Transcript ("Tr.") at 41-42; Administrative Record ("AR") at 378.) She graduated from Drury College in Springfield, Missouri, with a bachelor's degree in business and physical education. (AR at 225.) Since graduation, Keiser's employment has been in the field of marketing asset management products for various companies. (Tr. at 26; AR at 225-26.)

      First UNUM issued to CDC Investment Management Corp. ("CDC") a Group Long Term Disability Policy (the "LTD Policy"), bearing policy number 45667-002. The LTD Policy was in effect during the periods relevant to this action, and Keiser alleges coverage. (Joint Pre-Trial Order ("JPTO") at 3.)

II. Keiser's Employment at CDC

      Keiser worked as a marketer in the investment management business for over twenty-five years. (Tr. at 25-27.) As a marketer, Keiser worked at CDC and other asset management companies that manage pension and 401(k) plans for private and public companies and provide asset management services for high net-worth individuals. (Tr. at 26.) Keiser devoted most of her time contacting corporate "gatekeepers," the individuals responsible for their respective company's asset management decisions. (Tr. at 26-28; AR at 227.) As part of her efforts, Keiser made cold-calls, conducted one-on-one meetings, arranged private parties and

events and attended industry-specific conferences at least once a month.[2]  (Tr. at 27-28; AR at 227, 408.)

In June 1992, Keiser started her employment with CDC.  (JPTO at 3.)  CDC, an asset management company, manages pension and 401(k) plans for companies and provides asset management plans for high net-worth individuals.  While at CDC, Keiser worked from various locations, including her Manhattan office, out-of-office conference locations, client's offices, golf courses, restaurants, hotels, cars, trains and airplanes.  (AR at 408.)  Keiser spent approximately sixty to seventy percent of her time traveling for client development purposes.  (AR at 407-08.)  In addition to client development, Keiser was responsible for preparing presentations and documents describing the investment products of CDC, giving advice regarding development of investment products and helping draft written responses to requests for proposals.  (Tr. at 28-29; AR at 408-09.)

In 1995, Keiser's last full year at CDC, she was responsible for bringing in approximately $1.2-1.3 billion in assets.  (Tr. at 29-30.)  Her base salary was $175,000, and her commissions totaled over $600,000.  (Tr. at 29-30.)

In March 1996, Keiser and her supervisor, Seth Wohlberg ("Wohlberg"), agreed that Keiser would leave CDC.  Toward this end, Keiser and CDC executed a Resignation Acceptance Agreement dated March 15, 1996 ("Resignation Agreement"), which provided, inter alia:

> Your [i.e., Keiser's] resignation will be effective as of the close of business on June 30, 1996 (the Resignation Date).  It is agreed that following the Resignation Date, you will be entitled to

---

[2]  To the extent, Plaintiff's witnesses testified about industry norms regarding the work performed by marketing professionals, this Court will not credit such testimony because it is in the form of expert testimony and these proffering witnesses were never designated as experts on this issue.  See Fed. R. Civ. P. 26(a)(2); see also Fed. R. Evid. 701-03.

remain on the CDC active payroll, as if you were a full-time, active employee, for a three month severance period through September 30, 1996 (the Severance Period) and will continue to receive your base salary during the Severance Period. However, except as specifically set forth in this Agreement, you will not be required and shall not perform the duties of your employment with CDC or hold yourself out to others as an employee of CDC on or after March 31, 1996. During the Severance Period, you shall continue to be eligible to receive commissions with respect to any BRIC business originating from your assigned intermediaries and direct clients, as identified on Exhibit A hereto, and resulting in a consummated BRIC transaction prior to March 31, 1996 that gives rise to the right to receive commission payments in accordance with CDC's existing commission schedules and policies.

(AR at 246.) The Resignation Agreement required Keiser to attend some conferences on CDC's behalf, and to assist with arrangement for those conferences. (AR at 245.) While CDC would compensate Keiser for unused accrued vacation through March 31, 1996, she could elect to contribute to her CDC 401(k) profit sharing plan from her bonus payment scheduled for June 30, 1996. (AR at 245.)

As enunciated in the Resignation Agreement, Keiser continued her relationship-maintenance and public-relations work for CDC through June 1996. (Tr. at 31-32; Declaration of Seth Wohlberg, dated Sept. 7, 2000 ("Wohlberg Decl.") ¶¶ 7-8.) CDC provided Keiser with an executive office in Westchester until the end of September. (AR at 240; see also AR at 248 ("Connie's last day at the office was March 31, but she attended a few conferences on behalf of CDC between March 31 and June 30, 1996. . . . Her last day of employment officially was September 30, 1996.") The Resignation Agreement restricted Keiser from holding herself out as an employee of CDC after March 31, 1996 to ensure that she would not "bind CDC financially or contractually during the period from April 1, 1996 through June 30, 1996" and to wind down her activities for CDC. (Wohlberg Decl. ¶¶ 6, 8.)

Pursuant to the Resignation Agreement, Keiser attended three conferences on behalf of CDC: (1) the Guaranteed Investment Contract ("GIC") Conference in Naples, Florida, on April 20, 1996 (AR at 245; Declaration of Constance S. Keiser, dated Sept. 11, 2000 ("Kesier Decl.") ¶ 26); (2) the Association of Investment Management Sales Executives ("AIMSE") Conference in Orlando, Florida, on May 5, 1996 (AR at 245; Keiser Decl. ¶ 27); and (3) the Randy Cross Invitational Golf and Tennis Tournament at Stanford University ("Randy Cross Tournament") from June 9-11, 1996 (Keiser Decl. ¶ 28 & Ex. E: Registration Form.) CDC agreed to reimburse Keiser for the costs of attending the conferences. (AR at 240, 245.) In exchange for the reimbursement, Keiser was required to

> provide reasonable assistance as may be requested by CDC in arranging and planning CDC sponsored events and activities at such Conferences, including, without limitation, making such arrangements as may be necessary to assure that CDC retains its status as a participant and speaker at such Conferences.

(AR at 245.)

At the GIC Conference, Keiser organized a CDC-sponsored golf tournament and a private cocktail party for existing and prospective clients. (Keiser Decl. ¶ 26.) Similarly, with Wohlberg's approval, Keiser attended the AIMSE Conference as CDC's representative. (Keiser Decl. ¶ 27 & Ex. D.) Finally, Keiser also attended the Randy Cross Tournament as CDC's representative. (Keiser Decl. Ex. E.) There, upon Wohlberg's request, Keiser performed marketing-related functions for CDC. (Keiser Decl. ¶ 28.)

During this same period, Keiser kept in contact with many CDC clients and prospective clients by telephone and in person. (Tr. at 32; Keiser Decl. ¶ 29.) Keiser has submitted a chart documenting her time spent working on behalf of CDC. (Keiser Decl. ¶ 30;

<u>see also</u> Tr. at 33-36.)  Excluding personal time, Keiser spent 524.25 hours during the April-June period working for CDC.[3]  (Keiser Decl. ¶¶ 30, 32.)

Before Keiser and CDC ratified the Resignation Agreement, Keiser and Wohlberg agreed that from July 1, 1996, to September 30, 1996, Keiser would be on a severance leave. (Tr. at 31-33; <u>see also</u> AR at 246.)  During this period, CDC would consider Keiser a full-time employee receiving full benefits.  (Tr. at 31-33; <u>see also</u> AR at 246.)  During the Severance Period, CDC paid Keiser's premiums for her continued coverage under the LTD Policy.  (AR at 245-46.)

III.  <u>Keiser's Long Term Disability Policy</u>

As noted above, Keiser was covered under the LTD Policy.  (JPTO at 3.)  All CDC employees are eligible under the LTD Policy.  (AR at 30.)  The LTD Policy defines "employee" to mean "a person in active employment with the employer [<u>i.e.</u>, CDC]."  (AR at 26.) For active employment, the employee must be working:

1.  for the employer on a full-time basis and paid regular earnings (temporary or seasonal employees are excluded);

2.  at least the minimum number of hours shown in the policy specifications [<u>i.e.</u>, thirty hours]; and either

3.  at the employer's usual place of business; or

4.  at a location to which the employer's business requires the employee to travel.

---

[3]  Keiser attests that, excluding personal time, she spent 522.25 hours for CDC.  (Keiser Decl. ¶ 32.)  However, this Court's calculation indicates that the total number equals 524.25 hours, because on May 30, 1996, Keiser worked on CDC matters for at least two hours, although she designated it a personal day in her chart.  (<u>See</u> Keiser Decl. ¶ 30.)

(AR at 26, 29.)  An employee ceases to be insured if she is no longer in an eligible class or if her employment terminates.  (AR at 14.)  There are some exceptions to the termination policy.  For example,

> [T]he employer may continue the employee's insurance by paying the required premiums, subject to the following:
>
> i.      Insurance may be continued for the time shown in the policy specifications for an employee:
>
>       a)    temporarily laid off; or
>
>       b)    given leave of absence.

(AR at 14.)  The LTD Policy provides that coverage under the exception continues until "the end of the policy month following the policy month in which the [temporary] layoff or leave of absence begins."  (AR at 28.)

With respect to benefits, the LTD Policy provides that when First UNUM receives "proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, [First UNUM] will pay the insured a monthly benefit after the end of the elimination period."  (AR at 20.)  For coverage, "[t]he injury must occur while the employee is insured and disability must begin within 30 days of the injury."  (AR at 25.)  The LTD Policy defines "disability" and "disabled" to "mean that because of injury or sickness,"

> 1.    the insured cannot perform each of the material duties of his regular occupation; and
>
> 2.    after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience.

(AR at 22.)

The LTD Policy also provides for benefits if an employee is partially disabled: "When proof is received that an insured is partially disabled within 31 days of the end of a period

during which [she] received disability benefits, [First UNUM] will pay a monthly benefit.  The partial disability must result from the injury or sickness that caused the disability."  (AR at 20.)  The LTD Policy defines "partial disability" and "partially disabled" as follows:

> "[I]njury or sickness [due to which] the insured, while unable to perform all the material duties of his regular occupation on a full-time basis, is:
>
> 1.  performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and
>
> 2.  earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness.

(AR at 22.)  "'Indexed pre-disability earnings' means the insured's basic monthly earnings in effect just prior to the date his disability began" (AR at 25), while "'[b]asic monthly earnings' means the insured's monthly rate of earnings from the employer in effect just prior to the date disability begins [excluding] commissions, bonuses, overtime pay and other extra compensation."  (AR at 29.)

IV.  Keiser's Car Accident on August 30, 1996

On August 30, 1996, while visiting her parents in Missouri, Keiser's car was rear-ended by a truck traveling over 55 miles per hour.  Keiser II, 2003 WL 1733729, at *2.  (See also AR at 155, 406-07.)  Keiser's car was demolished.  (Tr. at 36; AR at 155, 406-07.)  While an ambulance came to the accident scene and Emergency Medical Technicians attended to Keiser, she declined to go to a hospital.  (Tr. at 38.)

The day after the accident, Keiser started experiencing pain, stiffness and blurry vision.  (Tr. at 38; AR at 136.)  On September 1, 1996, Keiser was taken to the emergency room at St. John's Regional Health Center ("St. John's") in Springfield, Missouri.  (Tr. at 38; AR at

136.)  The x-rays taken of her right knee, lumbar spine and cervical spine revealed no fractures, subluxations, abnormal soft tissue swelling or significant degenerative changes.  (AR at 132-34.)  Dr. Thomas Steele, who examined Keiser at St. John's, noted that Keiser was complaining of neck pain, back pain, left shoulder pain and right knee pain.  He concluded:  "Neurosensory exam is within normal limits in both upper and lower extremities.  Deep tendon reflexes are intact and motor exam is graded at normal.  X-ray evaluation of the cervical and lumbar spine revealed no gross abnormalities."  (AR at 136; see also AR at 132-34.)  Dr. Steele advised Plaintiff to engage in activities she could tolerate.  (AR at 135; see also AR at 129.)  He prescribed Vicodin (a narcotic analgesic) for pain and Flexeril (a muscle relaxant) for myospasm, and advised Keiser to return to the emergency department if she had other problems.  (AR at 135.)

Keiser returned to St. John's on September 10, 1996.  She told the attending doctor that "she went to a meeting about four days ago in Chicago and didn't take any medications and after her return was very sore for the next day and then two days after that she seemed to get a little better."  (AR at 142.)  Regarding the visit, the Emergency and Trauma Center Report noted the following:

> The patient had been seen in the Emergency Department about a week ago following a motor vehicle accident.  X-rays of her neck, lower back and knee had been done.  . . . She is planning on returning to her home in New York this week and is still having some pain in her neck and back.  She still is kind of generally tender in the musculature of the posterior neck, thoracic and lumbar area.  Denies numb tingly feelings in her arms.  X-ray reports from the radiologist were reviewed and were unremarkable.  We will place her on Indocin 25 mg. t.i.d. with food.  Continue her Flexil and pain medications.  To follow with her private physician upon return home.

(AR. at 142.)  Thereafter, Keiser returned to her home in New York.  (Tr. at 42.)

V. <u>Keiser's State of Health After the Accident</u>

A. <u>Keiser's Injuries</u>

Plaintiff continues to suffer injuries as a result of the August 30, 1996 accident. (AR at 405-06.) For example, Keiser can no longer "sit, stand, or perform any activity requiring [her] to be in any one position for any length of time without some type of pain medication." (AR at 406.) Since the accident, Keiser needs sleeping aids and pain pills to help her sleep, experiences fatigue and frequently requires ten to twelve hours of sleep per day. (AR at 406.) She has continuous headaches and blurry vision, which curtails her reading ability. (AR at 405.) In addition, it has become "very difficult for [Keiser] to travel." (AR at 405; Tr. at 40-41, 47, 59-60.)

Keiser's doctors corroborate her testimony regarding her injuries. Keiser consulted Dr. Arthur Pidoriano, a board-certified orthopedic surgeon, on September 18, 1996. Dr. Pidoriano's notes from their first meeting state:

> Thirty-nine year old [sic] female visiting parents rear ended in Springfield, Missouri. Drunk driver 8/30/96, no [loss of consciousness.] Blurred vision headaches. The car was totaled. . . . Hit top -- hit dashboard with legs, knee, stiffened up neck, went to the E.R. X-rays were negative on 9/1/96. Severe headaches, back and neck pain. No numbness or tingling. Right shoulder pain with overhead. No bowel or bladder changes. Right shoulder impingement. [Physical Therapy] Relafen, Lortab. Follow-up six weeks. If no improvement right shoulder x-ray.

(AR at 126; <u>see also</u> Transcript of Arthur Pidoriano Deposition, dated Mar. 18, 2002 ("Pidoriano Dep.") at 8-9.) Dr. Pidoriano diagnosed Plaintiff with a cervical sprain and right shoulder impingement. (Pidoriano Dep. at 9; <u>see also</u> AR at 126.) Dr. Pidoriano prescribed physical therapy, but did not impose any restrictions or limitations. (AR at 126.) Dr. Pidoriano prescribed Lortab for her "severe pain." (Pidoriano Dep. at 21, 32, 49-50.)

Keiser had a MRI on November 14, 1996. (AR at 122.) Dr. Pidoriano noted that the MRI "showed some Impingement syndrome at the supraspinatus tendon and inferior sloping acromion. The rotator cuff appears intact, as well as the labrum. There are some mild degenerative changes of the acromioclavicular joint." (AR at 122.) He added that Keiser "continues to have shoulder pain and some neck pain that radiates down the paraspinal area in the rhomboid area and down to the inferior angle of the scapula." (AR at 122.) He observed that Keiser had aggravated her condition by taking a business trip to San Francisco where "she had to be on her feet for long periods of time." (AR at 122.) Further, Keiser had "to lie down a few times a day and put her feet up, or else the pain in her back . . . [became] very severe." (AR at 122.) Based on his physical examination, Dr. Pidoriano concluded that Keiser's "neck has improved range of motion. There are no radicular symptoms. She has right shoulder impingement signs, positive pain with resisted scaptation. She is neurovascularly intact in the upper extremity. All reflexes are symmetric." (AR at 122.)

Dr. Pidoriano recommended surgery on Keiser's right shoulder. As a result, Keiser consulted Dr. Anthony Maddalo, a board-certified orthopedic surgeon, for a second opinion, on March 25, 1997. (Tr. at 63; AR at 41-42; see also Transcript of Anthony V. Maddalo Deposition, dated Feb. 27, 2002 ("Maddalo Dep.") at 6-7.) After reviewing Keiser's post-accident x-rays, Dr. Maddalo saw "some straightening and muscle spasm at the time of injury." (AR at 341.) From an MRI taken on June 4, 1997, Dr. Maddalo determined that Keiser had suffered a partial tear of the rotator cuff. (Maddalo Dep. at 43-46.) On June 23, 1997, Keiser underwent arthroscopic surgery to "remov[e] certain anatomical parts that may be irritating the rotator cuff." (Maddalo Dep. at 49-50) On September 4, 1997, Dr. Maddalo noted that Keiser "continues to require Lortab for [her] pain" and he also prescribed Relafen. (AR at

343.)   He noted that "[u]pon close questioning, it seems that she is continuing to work despite having discomfort and she is having quite a bit of cervical spasm with radiation down the interscapular area, as well as the trapezius."  (AR at 343.)  Dr. Maddalo did not place any limitations or restrictions on Keiser because of her shoulder problems.[4]  (AR at 49.)

In late May 1997, Dr. Maddalo referred Keiser to Dr. Richard Peress, a board-certified orthopedic surgeon, for treatment of her cervical, hip and back problems.  (Tr. at 63, 112; Transcript of Richard Peress Deposition, dated June 10, 2002 ("Peress Dep.") at 16-17 & Ex. 3: Curriculum vitae of Dr. Richard Peress.)   Dr. Peress saw Keiser for the first time on June 3, 1997 and recorded his observations from his interview of Keiser:

> Neck symptoms initially present has [sic] subsided and she is not suffering at present from chronic headaches or radicular pain.  She has occasional aches in the neck.  She has a severe attack of back pain following the accident at times unable to get out of bed practically.  On at least two occasions, there was a sharp radiation to the anterior abdominal wall.  This was felt as a deep stabbing pain in the umbilical region.  She got better with physical therapy after many months.

(AR at 155.)

Dr. Peress concluded that Keiser's x-rays revealed a "straightening of the cervical curvature" which resulted in "derangement of the ligament supporting structures, including the cervical disc, which are responsible for maintaining the alignment of the cervical spine, and its stability."  (Peress Dep. Ex. 2 ¶ 7; see also Peress Dep. at 88-91.)  He noted that some x-rays showed "five segmental lumbar vertebrae, with a possible fusion of the transverse processes to

---

[4]  Dr. Maddalo's notes suggest contradictory findings regarding Keiser's disability.  He noted that Keiser was not disabled due to her shoulder injury and was "capable of heavy work" (AR at 42), while, finding her to be "totally disabled" due to her neck problems (AR at 41.)  At his deposition, however, Dr. Maddalo testified that the statement regarding Keiser's neck problems was erroneously written by his secretary and that he never concluded she was disabled.  (Maddalo Dep. at 92-93.)

the sacroiliac joint," which "represents a variation of normal anatomy that is not infrequently seen in patients presenting with lower back complaints, and has been seen in my experience in association with sacroiliac instability following injury." (Peress Dep. Ex. 2 ¶ 7.) Dr. Peress expressed "concerns with regard to [Keiser's] sacroiliac joint." (Peress Dep. Ex. 2 ¶ 9.) "[B]ased on the mechanism of injury" – "her right foot extended onto the brake pedal at the time of multiple impacts," the impacts were "capable of transmitting force through the lower extremity to either the sacroiliac joint, or the lumbar spine."[5] (Peress Dep. Ex. 2 ¶ 9.)

### B. Keiser's Disability

Though this Court finds Keiser suffered injuries from the accident, it finds that those injuries did not leave Keiser disabled, as that term is defined in the LTD Policy.

When Keiser was examined by Dr. Steele after the accident, he discharged her from the emergency room without any restrictions on her activities, and allowed her to engage in "activity as tolerated." (AR at 129, 135.) On September 10, 1996, Keiser returned to St. John's and told Dr. John Elms that "she went to a meeting about four days ago in Chicago and didn't take any medications and after her return was very sore for the next day and then two days after that she seemed to get a little better." (AR at 142.) Dr. Elms did not impose any restrictions or limitations on plaintiff. (AR at 141-43.) Upon her return to New York, Keiser saw Dr. Pidoriano on a number of occasions. (AR at 119-27.) Despite Keiser's injuries, Dr. Pidoriano did not impose any restrictions on her activities. (AR at 122-26.) Similarly, Dr. Maddalo never directed Keiser to limit her activities. (AR at 41-50)) See also supra Section V.A n.4.

---

[5] Defendant objects to Dr. Peress' diagnosis of sacroiliac instability. (First UNUM's Response to Keiser's Proposed Findings, dated Aug. 27, 2004 ("First UNUM Response") at 14-15; see also AR at 1025-26.) This Court, however, finds that Dr. Peress' sacroiliac instability diagnosis is admissible, and that First UNUM's arguments go to the weight of such evidence.

When Dr. Peress first saw Plaintiff on June 3, 1997, he noted, based on Keiser's description, "[n]eck symptoms initially present has [sic] subsided and she is not suffering at present from chronic headaches or radicular pain. She has occasional aches in the neck." (AR at 155.) He further noted that Keiser got "better with physical therapy after many months." (AR at 155.) Dr. Peress did not mention that Keiser was disabled until July 28, 1997, when he noted that Keiser had a "[t]emporary, total disability." (AR at 150; see also Peress Dep. at 95-96, 100.) However, Dr. Peress conceded that his definition was based on Keiser's description of her "not being able to perform at whatever capacity she was used to," and was not the American Medical Association definition or the LTD Policy definition. (Peress Dep. at 95-96, 100.)

On September 11, 1997, Dr. Anthony Milea prepared a report on Keiser's medical condition for CDC. (AR at 1048-54.) Based on his independent evaluation of Plaintiff and her medical records, he concluded:

> There is no objective evidence of disability in relation to the cervical spine.
>
> There is no objective evidence of disability in relation to the lumbar spine or sacroiliac joints.
>
> This includes both physical examination and objective testing results.
>
> The patient exhibits mild, temporary, partial disability secondary to right shoulder impingement and status post arthroscopic subacromial decompression surgery [on June 23, 1997].
>
> Patient is capable of returning to work on a full-time basis in a position similar to her former occupation.

(AR at 1048-49.)

Additional evidence shows that even Keiser did not consider herself to be disabled during the two months after the accident. In August 1996, Plaintiff sought to purchase a disability policy from Guardian Life Insurance Company of America ("Guardian"). (AR at

1032-47.)  On August 7, 1996, Keiser submitted a policy application.  (AR at 1039.)  She amended the application on September 17, 1996 to report her accident.  (AR at 1040.)  In her amended application, Keiser did not claim any disability.  To the contrary, Plaintiff included copies of the radiology reports of the x-rays taken at St. John's (AR at 1032-34, 136) with a cover-note:  "here's completed forms plus letters from radiologists (?) stating 'clear.'" (AR at 1036.)  Indeed, the reports indicate that "[n]o fractures, subluxations, or foreign bodies are identified" and "[t]he bones are essentially normal in appearance."  (AR at 1034.)  Further, "[n]o abnormal soft tissue swelling is present" and "[n]o significant degenerative changes are present" (AR at 1032).  Keiser concedes that she neither told Guardian about her alleged disability, nor submitted documents to reveal her disability.  (Keiser Dep. at 39-42, 49.)

VI.  Keiser's Post-Accident Employment History

On October 4, 1996, approximately one month after her accident, Keiser signed an employment agreement (the "JNL agreement") with Jackson National Life ("JNL").  (AR at 233-35.)  The JNL agreement provided that Keiser would commence her employment with JNL on October 14, 1996, as the "Director of Stable Value Marketing."  (AR at 235.)  JNL's Stable Value department is the company's asset management and marketing arm.  (AR at 404.)  At JNL, Keiser was to perform the same functions she had performed at CDC, except that her territory included the entire country.  (Tr. at 52-53; AR at 404.)  JNL agreed to pay Keiser an annual salary of $150,000 in "bi-weekly installments."[6]  (AR at 235.)  The JNL agreement "guarantee[d] [Keiser] employment with JNL through March 30, 1997."  (AR at 234.)

---

[6]  Plaintiff's base salary of $150,000 equals $12,500 a month.  (AR at 235.)

The quality of Keiser's work at JNL is heavily disputed by the parties. Keiser contends that because her job performance was inadequate, she was disabled even while she worked at JNL. (Tr. at 55-56.) Notably, Keiser does not contend that she was unable to work at JNL, but that she was unable to work to the best of her ability: "Did I work? Yes. Did I work as good as I could? No." (Keiser Dep. at 267; see also Tr. at 55-56.) First UNUM responds that Keiser performed her job responsibilities at JNL, and therefore she was not disabled.

Keiser testified that, prior to her being hired, she advised JNL about her accident and that she was under a physician's care, was regularly attending physical therapy and her ability to work was limited. (Keiser Dep. at 34, 37-39.) However, Victor Gallo ("Gallo"), Senior Vice President of JNL, testified that, while she "mentioned numerous times . . . that she had been in a car accident" and that she had pains in her "shoulder and back and neck," he did not recall Keiser suggesting that her physical condition might interfere with her ability to perform her job at JNL. (AR at 939, 942-43). This Court credits Gallo's testimony because he is an uninterested party and his recollection is convincing. Further, this Court hesitates to credit Keiser's recollection on this point in light of the following statement she made: "Following the accident, I had difficulty remembering information I provided to and received from clients, peers and management. I frequently repeated myself or asked for the same information a second time. My concentration was extremely impaired due to the chronic pain I experienced and the pain medication I was on." (AR at 401.)

Keiser has been inconsistent in reporting her work status at JNL, i.e., whether she was full-time or part-time. For example, in her Long Term Disability Claim, Keiser contends that she worked part-time at JNL and that she "tried to go to work on a full-time basis [but was] unable to do so." (AR at 60; see also Complaint, dated Dec. 15, 1999 ("Compl.") ¶ 19.)

However, during her deposition, Keiser conceded that she was hired to work full-time. (Keiser Dep. at 50-51; see also AR at 761-82, 942-43.) These contradictory statements by Keiser raise doubt about her recollection.

The JNL agreement provided that Keiser would "work out of [her] home in New York." (AR at 234.) Further, "JNL [would] provide a FAX machine, a phone line, a cellular phone, and [would] pay all reasonable expenses associated with providing employee services." (AR at 234.) Keiser contends that JNL created a home office to "accommodate [her] physical limitations." (AR at 403.) Gallo, however, testified that JNL afforded Keiser a home office for reasons of efficiency, because "in marketing, a person, by definition, does not need to be sitting in the office." (AR at 943-44.)

Plaintiff testified that her work and her reputation helped JNL bring in "several hundred million dollars in investment money." (Tr. at 107-08). Keiser explained that her "name on the door added credibility to the firm since JNL was a new entry into the asset management business" and that she was "credited" for $10 million in new investments. (Tr. at 107-08, 125.) Indeed, Plaintiff's superiors were "happy with the results that [Keiser's] input to the group had produced." (Keiser Dep. at 250; see also AR at 929-30.) While Keiser worked at JNL, JNL's parent company imposed a dollar limit on the amount that JNL was permitted to manage. (Keiser Dep. at 251.) During Keiser's tenure, JNL met that maximum and was unable to accept additional cash for investment. (Keiser Dep. at 251-52.)

Plaintiff contends that, with the exception of "making a few telephone calls," (Plaintiff's Proposed Findings of Fact and Conclusions of Law, dated Aug. 9, 2004 ("Pl. Mem.") at 29: Proposed Finding of Fact ¶ 93), she was unable to do much work for JNL after her June 1997 surgery. (Keiser Dep. at 268-70.) However, Keiser's testimony is contradicted by Gallo,

who testified that Keiser was working for JNL in August 1997.  (AR at 900-01.)  Indeed,

Plaintiff remained on JNL's payroll until the end of August 1997 and during this time received

her full base salary from JNL.  (Tr. at 88-89.)

Accordingly, this Court finds that Keiser adequately performed her job at JNL

until the end of August 1997, although she may not have satisfied her own exacting standards.


VII.  Keiser's Long Term Disability Claim

Plaintiff submitted a claim to First UNUM on September 4, 1997, approximately

one year after her accident.  (AR at 53-60.)  In her claim, Keiser stated that she was disabled as

of August 30, 1996 due to "pain from multiple orthopedic injuries."  (AR at 60.)  Keiser noted

that her first date of treatment was September 1, 1996.  (AR at 60.)  In her claim, Keiser

represented that August 30, 1996 was her last "full day" at CDC.[7]  (AR at 60.)  Plaintiff also

stated that she returned to work on a "part time" basis on October 15, 1996, and explained that

she "[t]ried to go to work on a full time basis[, but was] unable to do so."  (AR at 60.)  In

addition to her claim, Keiser also submitted an unsigned copy of a Long Term Disability Claim

Employer's Statement.  (AR at 55-56.)  In that form, Plaintiff indicated that her basic monthly

salary was $14,583.33.  (AR at 55.)  Keiser also provided reports from Dr. Madallo and Dr.

Peress.  (AR at 40-50, 53, 107-08.)

By letter dated November 12, 1997, First UNUM denied Keiser's application for

LTD benefits.  (AR at 270-72.)  It asserted several grounds for the denial, including, inter alia,

Plaintiff's subsequent employment with Jackson National Life ("JNL"), failure to demonstrate

---

[7]  During this litigation, Keiser acknowledged that her last day at CDC was June 30, 1996.  (Tr.
at 118-19; Pl. Mem. at 10-11: Proposed Finding of Fact ¶ 38.)

disability under the terms of the LTD Policy and the termination of coverage before her August

1996 accident. (AR at 270-72.)

Keiser appealed the denial to First UNUM's Quality Review section. (AR at 278-

79.) By letter dated January 19, 1998, First UNUM rejected Keiser's appeal. (AR at 285-87.)

First UNUM explained that Keiser did not meet the LTD Policy's "active employment"

requirement after March 31, 1996, and thus was "not eligible for coverage of her disability as she

was no longer covered under the policy after" that date. (AR at 285.)

Keiser commenced this action on December 16, 1999. On March 4, 2002, after

an additional administrative review conducted during this litigation, First UNUM issued yet

another denial of Keiser's claim. (AR at 1012-20.) In support of its decision, First UNUM

reasoned, inter alia, that Keiser was not an active employee of CDC after March 31, 1996 and

thus her August 30, 1996 accident was not covered under the LTD Policy, and that she was not

disabled after her accident. (AR at 1014-15.)

## CONCLUSIONS OF LAW

Section 1132(a)(1)(B) of ERISA states in pertinent part:

> A civil action may be brought ... by a participant or beneficiary ...
> [t]o recover benefits due to him under the terms of his plan, to
> enforce his rights under the terms of the plan, or to clarify his
> rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B). The parties agree that this Court should review First UNUM's denial

of Keiser's benefits de novo. Keiser I, 160 F. Supp. 2d at 518; see also Firestone Tire & Rubber

Co. v. Bruch, 489 U.S. 101, 114-15 (1989); Locher v. Unum Life Ins. Co. of Am., 389 F.3d 288,

288, 290-91 (2d Cir. 2004); Muller v. First Unum Life Ins. Co., 341 F.3d 119, 125 (2d Cir.

2003); DeFelice v. Am. Int'l Life Assurance Co., 112 F.3d 61, 66 (2d Cir. 1997). Under de novo

review, "a district court may render a determination on a claim without deferring to an administrator's evaluation of the evidence," and "is free to evaluate a treating physician's opinion in the context of any factors it considered relevant, such as the length and nature of their relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence." Locher, 389 F.3d at 296-97 (citation, internal quotation marks and brackets omitted). "A fortiori, a district judge's freedom of evaluation extends to the opinions of non-treating physicians who have not examined a plaintiff and base their opinions solely upon the documents in an insurance company's claim file." Sheehan v. Metro. Life Ins. Co., No. 01 Civ. 9182 (CSH), 2005 WL 627636, at *22 (S.D.N.Y. Mar. 17, 2005).

Plaintiff bears the burden of proving entitlement to a disability benefit. See Juliano v. Health Maint. Org. of N.J., 221 F.3d 279, 289 (2d Cir. 2000); Abnathya v. Hoffman-Laroche, Inc., 2 F.3d 40, 46 (3d Cir. 1993); George v. First Unum Life Ins. Co., No. 93 Civ. 2916 (HB), 1996 WL 701018, at *2 (S.D.N.Y. Dec. 5, 1996).


I. Consideration of Evidence Beyond the Administrative Record

Although a district court's de novo review of an ERISA plan determination is generally limited to the administrative record, the court may consider additional evidence for good cause. DeFelice, 112 F.3d at 67; see also Locher, 389 F.3d at 293-95. In Locher, the Second Circuit addressed what constitutes "good cause":

> We take this opportunity to clarify our holding in DeFelice and make plain that a conflict of interest does not per se constitute "good cause" to consider evidence outside of the administrative record upon a de novo review of factual issues bearing on an administrator's denial of ERISA benefits. . . .
>
> * * *

> We hold that a conflicted administrator does not per se constitute good cause, and caution district courts that a finding of a conflicted administrator alone should not be translated necessarily into a finding of good cause. In the case at hand, we hold that the District Court's finding of good cause is bolstered in part by the finding that there were insufficient procedures for internal or appellate review. In so finding, we do not conclude that a finding of a conflicted administrator, standing alone, can never constitute good cause. We need not address that possibility here, as it is not presented to us, but we note that it may be possible, in unforeseen circumstances, for good cause to rest entirely on the existence of a conflicted administrator.

389 F.3d at 294, 296 (emphasis in original). Good cause to consider evidence outside the administrative record might exist even where there is no conflict of interest. See Locher, 389 F.3d at 296.

This Court has found a common interest between the administrator determining eligibility and the source of payment in this case. Keiser I, 160 F. Supp. 2d at 518-19; Keiser II, 2003 WL 1733729, at *10. Further, during the course of this litigation, this Court ordered a second administrative review of Keiser's disability status. Keiser II, 2003 WL 1733729, at *2. On March 4, 2002, First UNUM completed the second administrative review. Keiser II, 2003 WL 1733729, at *2. Following the second administrative review, this Court directed Keiser to "answer all questions regarding the actual duties she performed for, and/or was required to perform by, CDC in the weeks and months before her accident." Keiser II, 2003 WL 1733729, at *11. First UNUM's application for this additional evidence was made more than a month after the end of the second administrative review. Keiser II, 2003 WL 1733729, at *11. Similarly, this Court has allowed Plaintiff to introduce evidence outside the administrative record. See Keiser II, 2003 WL 1733729, at *11; Keiser I, 160 F. Supp. 2d at 517. Given that both parties have benefited from discovery dehors the administrative review, this Court will exercise its discretion and consider the full trial record.

Further, First UNUM's selective choice of materials for inclusion in the administrative record warrants this Court's consideration of all evidence. For example, First UNUM excluded from the administrative record the deposition transcript of Mr. Maddalo, one of Keiser's treating physicians, but included the deposition transcript of Gallo, an employee at JNL. Presumably, Gallo's testimony was helpful to First UNUM, while Dr. Maddalo's was not. This suggests that the integrity of the administrative record was compromised. In any event, this Court conducted a thorough examination of documents produced after the second administrative review and has considered only the relevant ones. (Tr. at 3-6; see also note 2, supra.)

This Court concludes that good cause supports its consideration of evidence outside the administrative record. See DeFelice, 112 F.3d at 67; Locher, 389 F.3d at 293-96; see also Sheehan, 2005 WL 627636, at *25 (assuming "an active role in order to ensure a comprehensive and impartial review of the case" and examining facts other than the structural conflict); Napoli v. First UNUM Ins. Co., 99 Civ. 1329 (GEL), 2005 WL 167598, at *2-3 (S.D.N.Y. Jan. 25, 2005).


II. Plaintiff's Coverage Under the Policy

First UNUM denied Keiser's claim on the ground that she was not covered under the LTD Policy on August 30, 1996, the date of the accident. (AR at 1003.) This Court concludes that Keiser was actively employed with CDC through June 30, 1996. Further, this Court concludes that Plaintiff was on a terminal leave of absence from CDC from July 1 through August 31, 1996, and, therefore, had coverage during that period. Accordingly, as discussed below, Keiser was covered by the LTD Policy on August 30, 1996.

A.  Keiser's Last Date of Active Employment

As already noted, in March 1996, Keiser and CDC executed a Resignation Agreement which provided that Keiser would resign from CDC effective as of the close of business on June 30, 1996.  (AR at 246.)  The Resignation Agreement provided that following June 30, 1996, Keiser would remain on the CDC active payroll at her base salary as if she were a full-time active employee, for a three month Severance Period through September 30, 1996. (AR at 246.)  However, with the exception of certain duties listed in the Resignation Agreement, starting March 31, 1996, Keiser was forbidden from performing the regular duties of her employment or from holding herself out to others as a CDC employee.  (AR at 246.)

Based on Wohlberg's testimony, this Court finds that Keiser continued her relationship-maintenance and public-relations work on CDC's behalf during the April-June 1996 period.  (Tr. at 31-32; Wohlberg Decl. ¶¶ 7-8.)  CDC provided Keiser with an executive office in Westchester for six months.  (AR at 240.)  Pursuant to the Resignation Agreement, Keiser attended three conferences on behalf of CDC between April and June 1996 (AR at 245; Keiser Decl. ¶¶ 26-28 & Ex. E), and CDC agreed to reimburse Keiser for the costs and expenses of attending the conferences.  (AR at 240, 245.)  Further, Keiser stayed in contact with CDC clients and prospective clients, as expected by CDC.  (Tr. at 32-36; Keiser Decl. ¶¶ 29, 30, 32.)

This Court credits Keiser's account of the time she spent on CDC-related work during the April-June period.  First, there is no evidence contradicting Keiser's testimony, and also because Keiser's out-of-office travel was in furtherance of CDC's business interests, it constituted a usual place of business for a CDC employee in Keiser's role.  Second, Keiser's account is amply corroborated by Wohlberg, an uninterested party (Wohlberg Decl. ¶ 7), and the records of the conferences Keiser attended on behalf of CDC.  Moreover, CDC's reimbursement

of expenses for these conferences supports Keiser's claim that her employment was ongoing. Finally, CDC paid Keiser her full-time salary for the April-June period, and allowed Keiser to elect to make a contribution to her CDC 401(k) profit sharing plan from her bonus payment scheduled for June 30, 1996. CDC's payment of a full-time salary to Keiser is powerful proof that she was CDC's full-time employee until the end of June 1996. Indeed, the Resignation Agreement by precluding Keiser from "performing any duties and holding herself out as a CDC employee," altered but did not end her employment. Accordingly, this Court concludes that the Resignation Agreement's provision precluding Keiser from "performing any duties and holding herself out as a CDC employee" altered her employment rather than ended it.

First UNUM contends that Keiser cannot show that she worked full-time at CDC until the end of June 1996, because she worked fewer than thirty hours per week during the last two weeks of June 1996, and also because Keiser performed no work for CDC after June 27 or June 28, 1996. This Court disagrees. For the four weeks in June 1996, Keiser worked a total of 154.25 hours for CDC (Keiser Decl. ¶ 30), averaging approximately 38.50 hours per week. Were this Court to hold that Keiser's failure to work more than 30 hours in the last two weeks deprives her of full-time employment status, it would endorse the absurd notion that coverage for LTD benefits fluctuates with an employee's weekly work schedule. Indeed, under First UNUM's suggestion, an employee could be covered for LTD benefits one week, but not the next and then, covered again the third week, based on weekly hours. See Morris v. Mut. Ben. Life Ins. Co., 258 F. Supp. 186, 190 (N.D. Ga. 1966) ("[I]t would be unreasonable to assume that the parties intended a contract whereby any regular employee would be excluded [from coverage] during any week in which he did not work 30 hours because of illness, vacation, etc."). This Court will not adopt such an unworkable solution.

Second, First UNUM contends that Keiser's employment ended on June 28, 1996, since she "performed no work at all for CDC after June 27 or June 28, 1996." (First UNUM's Proposed Findings of Fact and Conclusions of Law, dated Aug. 9, 2004 ("Def. Mem.") at 42: Proposed Conclusion of Law ¶ 8.) This Court rejects First UNUM's contention because the last two days of June 1996 fell on a weekend. The suggestion that Keiser was not a full-time employee until the end of June 1996 because she did not work on Saturday, June 29, 1996, and Sunday, June 30, 1996, is untenable.

B. <u>Keiser's Terminal Leave of Absence</u>

The LTD Policy provides that an employee's coverage ceases when her employment terminates, except "insurance may be continued for the time shown in the policy specifications for an employee . . . given a leave of absence." (AR at 14.) The LTD Policy further provides that a leave of absence may last "[t]o the end of the policy month following the policy month in which the layoff or leave of absence begins." (AR at 28.) The LTD Policy does not define "leave of absence." Through the Resignation Agreement, Keiser and CDC agreed that Keiser would be on a severance leave from July 1, 1996 through September 30, 1996, and during that time CDC would consider Keiser a full-time employee by affording her full base salary and complete benefits. (AR at 246; <u>see also</u> Tr. at 32-33.) During the Severance Period, CDC paid the premiums on behalf of Keiser for her continued coverage under the LTD Policy. (AR at 245-46.)

Thus, the preliminary issue is whether Keiser's severance leave qualifies as a leave of absence. First UNUM contends that a "leave of absence" is not the same as "severance," and equating the two would impermissibly rewrite the LTD Policy. First UNUM has proffered

no evidence to show that the term "Severance Period" in the Resignation Agreement was not intended to mean leave of absence. Instead, First UNUM woodenly argues that because the Resignation Agreement did not expressly provide that Keiser was going on a "leave of absence," her severance period cannot be considered a leave of absence. This Court disagrees.

CDC paid Keiser her full-time salary until the end of September 1996. The Agreement also provides that Keiser would "continue to be eligible to receive commissions" during the Severance Period and that her benefits would continue during that time. (AR at 246.) Keiser's testimony remains uncontradicted that before she resigned from CDC, she and Wohlberg agreed that she would be on a leave of absence from July 1, 1996, to September 30, 1996, and would be treated as CDC's full-time employee. (Tr. at 32-33.) Indeed, the Resignation Agreement reflects this fact. (AR at 245-46.) Thus, in light of CDC's treatment of Keiser as a full-time employee during the Severance Period and Keiser's agreement with Wohlberg, this Court finds that Plaintiff was on a leave of absence from July 1, 1996, to September 30, 1996. See, e.g., Pearce v. Paul Revere Life Ins. Co., No. Civ. 01-665, 2002 WL 1976014, at *2-3 (D. Minn. Aug. 23, 2002) (finding that an employee's severance leave constituted "leave of absence" within the meaning of LTD policy, where employer considered employee "to be on a paid leave of absence"); Woodson v. Manhattan Life Ins. Co. of New York, 743 S.W.2d 835, 839 (Ky. 1987) (finding that evidence supported a conclusion that employee was on a leave of absence where he was on six months of salary continuation after his resignation and the employer's secretary/treasurer testified that employee was on a "severance leave"). Indeed, "[t]he unqualified term 'leave of absence,' if not ambiguous, can only mean that a person is covered on any leave of absence including terminal leave." Woodson, 743 S.W.2d at 839.

First UNUM has also argued that Keiser's resignation precludes finding that she was subsequently on a terminal leave of absence. Keiser I, 160 F. Supp. at 521. The LTD Policy does not, however, contain any such exception, and First UNUM cites no authority for the principle that a resignation necessarily precludes a subsequent terminal leave of absence. "[A]ssuming that the policy language is ambiguous, it must be interpreted against the insurance company." Woodson, 743 S.W.2d at 839; see also I.V. Servs. of Am., Inc. v. Trustees of the Am. Consulting Engs. Council Ins. Trust Fund, 136 F.3d 114, 121 (2d Cir. 1998) (the rule of contra proferentem applies to ERISA plans). Based on the evidence presented, this Court concludes that when CDC and Keiser entered into the Resignation Agreement, CDC believed that Keiser would be an employee on a terminal leave of absence during the Resignation Period. See, e.g., Woodson, 743 S.W.2d at 837-38 (finding that the resigning employee could remain as an employee on a "terminal leave of absence" for six months while his salary was paid).

Because Keiser's full-time employment ended on June 30, 1996 (supra Section II.A), her leave of absence started on July 1, 1996. The LTD Policy provides that a leave of absence lasts "[t]o the end of the policy month following the policy month in which the . . . leave of absence begins." (AR at 28.) Accordingly, this Court concludes that Keiser was entitled to coverage under the Plan until August 31, 1996. Thus, Keiser's accident occurred while she was covered under the LTD Policy.

III. Keiser's Entitlement to Benefits

To be eligible for benefits, under the LTD Policy, Plaintiff must establish that her "disability . . . beg[a]n within 30 days of the injury" sustained in the accident. (AR at 25.) The LTD Policy further provides that an insured is disabled because of an injury if "the insured

cannot perform each of the material duties of [her] regular occupation; and [] after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which [she] is reasonably fitted by training, education or experience." (AR at 22 (emphasis added).) Thus, to show that she was disabled from the accident, Keiser must demonstrate that she could not perform each material duty of her occupation.

Keiser bears the burden of proving her disability. See Juliano, 221 F.3d at 289; Napoli v. First UNUM Ins. Co., 99 Civ. 1329 (GEL), 2005 WL 975873, at *7 (S.D.N.Y. Apr. 22, 2005). As already noted, while Keiser's doctors treated her for injuries, none of them considered her disabled until July 1997 – almost a year after the accident, when Dr. Peress deemed her disabled. (See AR at 150; see also Peress Dep. at 95-96, 100.) Indeed, none of Keiser's doctors imposed any restriction on her activities. Thus, First UNUM found, based on the medical evidence, that Keiser was not disabled from the accident. (AR at 270-72, 285-87, 1012-20.) "[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003). Nor must they "credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition." Black & Decker, 538 U.S. at 825. "Courts reviewing such decisions similarly are free to consider all the evidence, without giving special deference to the treating physician's opinion." Napoli, 2005 WL 975873, at *7.

This Court concludes that the evidence supports First UNUM's determination that Keiser's injuries did not render her disabled. As noted, none of Keiser's treating physicians deemed her disabled until almost a year after the accident; instead, these physicians noted Keiser's improving condition and lack of disabling injuries. (AR at 122, 126, 132-34, 136, 142, 155.) Similarly, Dr. Milea prepared a report on Keiser's medical condition for CDC and found

Keiser not disabled. (AR at 1048-49.) Additionally, in August-September 1996, Plaintiff sought to purchase a disability policy from Guardian. (AR at 1032-47.) As part of her application, Keiser submitted copies of the radiology reports of the x-rays taken at St. John's. (AR at 1032-36.) Those reports disclose that Keiser had not suffered any disabling injuries. (AR at 1032, 1034.)

Keiser argues that the LTD Policy's language, "unable to perform each of the material duties," means "unable to perform one or more of the material duties." (Pl. Mem. at 50-51: Conclusion of Law ¶ 3.) In Doe v. Cigna Life Ins. Co. of N.Y., the policy defined "disabled" as "unable to perform all the material and significant duties of [one's] occupation." 304 F. Supp. 2d 477, 497 (W.D.N.Y. 2003). Plaintiff argued "that the Policy term 'all of his material and substantial duties' require[d] that Plaintiff show only that he was unable to perform a single material and substantial duty of his occupation." 304 F. Supp. 2d at 499. The court rejected that interpretation:

> The phrase "unable to perform all of the material and substantial duties of his occupation" means completely unable to carry out every important and essential component of Plaintiff's occupation as an attorney. It therefore is contrary to a plain reading of the Policy that to be considered "disabled" Plaintiff would need only show that he is incapable of accomplishing just one of his material duties as an attorney.

304 F. Supp. 2d at 499; see also George v. First Unum Life Ins. Co., No. 93 Civ. 2916 (HB), 1996 WL 701018, at *2 (S.D.N.Y. Dec. 5, 1996) ("Here, the policy defines disability as the inability to perform "each" of the material duties of an insured's regular occupation. This language has been held to mean the inability to perform a substantial part of the normal duties of the insured's occupation."). Accordingly, this Court disagrees with Keiser and concludes that the phrase at issue means "unable to perform substantially all material duties."

"[A]n insured is disabled when [a return to her employment] would aggravate a serious condition affecting the insured's health." Lasser v. Reliance Standard Life Ins. Co., 146 F. Supp. 2d 619, 628 (D.N.J. 2001). Said differently, "[a]n insured is disabled 'when it is impossible for [her] to work without hazarding [her] health or risking [her] life.'" Napoli, 2005 WL 975873, at *7 (quoting 1C Appleman, Insurance Law & Practice § 651 at 241 (1981)). In light of Keiser's satisfactory job performance at JNL, this Court finds that Keiser has failed to meet this burden. See Kunstenaar v. Conn. Gen. Life Ins. Co., 902 F.2d 181, 184 (2d Cir. 1990) ("Plaintiff confuses illness with total disability. No one is disputing the fact that [plaintiff] was ill. In fact, he may have been ill since June of 1985. However, illness is not to be equated with total disability."); Zimmer v. Reliance Std. Life Ins. Co., No. 96 Civ. 5918 (RPP), 1998 WL 661492, at *8 (S.D.N.Y. Sept. 25, 1998), aff'd, 210 F.3d 356 (2d Cir. 2000) ("[B]ased on the record, no reasonable factfinder could find that Zimmer was 'totally disabled' during his employment at PW. Zimmer never qualified for benefits under the policy because, while he apparently worked with considerable pain and possibly should have had surgery, Mr. Zimmer made the choice to continue working."); Harrigan v. New Eng. Mut. Life Ins. Co., 693 F. Supp. 1531, 1535 (S.D.N.Y. 1988) ("Although the tumor was present during the period of time in which [plaintiff] was in the employ of Brunschwig, that fact does not necessitate a finding that the plaintiff was disabled as that term is defined in New England Mutual Policy. . . . Up until the time plaintiff left Brunschwig, the signs and symptoms associated with the tumor did not prevent the plaintiff from performing the requirements of his job. Indeed, he was an exemplary employee.").

Keiser's employment with JNL between October 14, 1996 and August 1997, also raises doubt about her disability. As discussed above, Keiser was employed by JNL as a full-

time employee, and held the same occupation she had at CDC. JNL Senior Vice President Gallo testified that he did not recall Keiser suggesting that her physical condition might interfere with her ability to perform her job at JNL. (AR at 939, 942-43.) Further, JNL "credited" Keiser for $10 million in new investments. (Tr. at 107-08, 125.) Not surprisingly, Plaintiff's superiors were "happy with the results that [Keiser's] input to the group had produced." (Keiser Dep. at 250; see also AR at 929-30.) Thus, the evidence is clear that Keiser adequately performed her job at JNL, although she may not have lived up to her own standards. Indeed, if a policyholder can perform the duties of a "position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties," she is not totally disabled. Blasbalg v. Mass. Cas. Ins. Co., 962 F. Supp. 362, 367 (E.D.N.Y. 1997) (internal quotation marks omitted); see also Dawes v. First Unum Life Ins. Co., 851 F. Supp. 118, 122 (S.D.N.Y. 1994).

Finally, to the extent Keiser contends that her injuries rendered her partially disabled under the terms of the LTD Policy, this Court disagrees. Under the LTD Policy, for an insured to be considered partially disabled, the insured must be "earning currently at least 20% less per month than [her] indexed pre-disability earnings due to that same injury or sickness." (AR at 22.) However, Keiser's monthly salary at JNL was $12,500.00 (AR at 235), and her monthly salary at CDC was $14,583.33 (Tr. at 29-30). While Keiser's monthly earning at JNL was less than her earning at CDC, it was not "at least 20% less." Thus, Keiser does not qualify for partial disability.

## CONCLUSION

Accordingly, judgment is granted in favor of First UNUM confirming its administrative determination. The foregoing constitutes this Court's findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure. The Clerk is directed to enter judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure and mark this case closed.

Dated: June 8, 2005
     New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Copies mailed to:*

Debra L. Raskin, Esq.
Kevin Mintzer, Esq.
Vladeck, Waldman, Elias & Engelhard, P.C.
1501 Broadway, Suite 800
New York, New York 10036
*Attorneys for Plaintiff*

Patrick W. Begos, Esq.
Begos & Horgan, LLP
7 Pondfield Road
Bronxville, New York 10708
*Attorneys for Defendant*